## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>KAHUKU HOSPITAL,<br><br>　　　　Debtor. | Case No. 07-00176<br>Chapter 11<br><br><br>Re: Docket No. 877, 880 |

## MEMORANDUM OF DECISION ON FINAL COMPENSATION

Section 330 of the Bankruptcy Code permits the bankruptcy court to allow "reasonable compensation for actual, necessary services rendered by" attorneys for a chapter 11 debtor in possession. In this successful chapter 11 case, general and special counsel to the debtor in possession argue that "reasonable compensation" should be greater than the hours expended by the firms' attorneys multiplied by the attorneys' normal hourly rates.

## FACTS

The debtor owned a small hospital on the North Shore of Oahu, a rural area with little population but many visitors. The debtor's income fell short of its operating expenses for many years. The debtor survived only with support from the State of Hawaii. In November 2006, the debtor's board of directors concluded that the hospital could not continue to operate, and therefore they voted for an orderly shutdown by December 31, 2006.

The complete closure of the hospital would have been disastrous for the North Shore community. The hospital provided many services, including the only emergency room in the area. The next closest emergency room is forty-five minutes to an hour away by road, much too far for critically ill patients.

In order to forestall this result, State of Hawaii government leaders and legislators told the hospital board that the State would provide an additional grant of $950,000 so the hospital could stay open, file a bankruptcy case to preserve the status quo, and explore a possible sale of the hospital to the State. With this assurance, the debtor filed this case on February 23, 2007. The governor approved the grant on March 29, 2007. A few months later, on May 31, 2007, the governor approved an appropriation of up to $2,900,000 to finance the acquisition of the hospital by the Hawaii Health Systems Corporation ("HHSC"), a state instrumentality that owns and operates public hospitals, and an additional $1,000,000 to cover HHSC's transitional expenses.

After filing this case, the debtor sought and obtained approval to retain Gelber, Gelber & Ingersoll as its general counsel and Torkildson Katz Fonseca Moore & Hetherington as its special counsel concerning labor, employment, healthcare, and corporate law matters.

The debtor and HHSC began to negotiate the acquisition of the hospital by

2

HHSC. They entered into a management services agreement, pursuant to which HHSC agreed to operate the hospital for the debtor and to advance money to cover any operating losses incurred while the acquisition terms were negotiated and necessary regulatory approvals were sought. The court approved the agreement by orders entered on June 29, 2007 (dkt. 191) and July 26, 2007 (dkt. 210).

HHSC and the debtor eventually reached a definitive agreement on the terms of the purchase. The court approved the agreement on October 30, 2007.

The transaction did not close as originally scheduled on October 31, 2007. This was partly because, at HHSC's insistence, the transaction was structured as an asset purchase. This gave HHSC greater protection from the debtor's liabilities but required additional regulatory approvals. Disputes also arose between the debtor and HHSC about the allocation of certain expenses and other questions under the operating and purchase agreements. In March 2008, the court approved a settlement of these issues and the transaction closed.

Both before and after the sale closed, the debtor and its counsel scrutinized the claims against the estate and objected to or settled those that were doubtful. This reduced the debtor's liabilities by over forty percent, from $4,442,870 to $2,544,159. Counsel also did everything else needed to conclude the chapter 11 case.

3

As a result of these efforts, the hospital continues to serve its community, all allowed claims against the debtor have been paid in full (with interest where required by law), and there is a surplus of over $1,000,000.00. Very few cases in this district have been as successful as this one.

For their services, the law firms seek compensation at their usual hourly rates and reimbursement of expenses (totaling $787,198.54 for general counsel through October 17, 2011, and $312,285.83 for special counsel through October 31, 2011) plus an "upward adjustment" applied to the compensation. The firms suggest that an upward adjustment of ten to fifteen percent is warranted.

The debtor has given proper notice of both applications. No one objects to the allowance of compensation and reimbursement at the firm's usual hourly rates. The Office of the United States Trustee and HHSC object only to the request for an upward adjustment.

## LEGAL STANDARD

Section 330 of the Bankruptcy Code permits the court to award "reasonable compensation for actual, necessary services" rendered by counsel to a debtor in possession. Congress intended that lawyers obtain substantially the same compensation in bankruptcy cases as they would in nonbankruptcy matters, in order to attract skilled counsel to the bankruptcy field. In re Busy Beaver Bldg.

4

Ctrs., Inc., 19 F.3d 833, 848-50 (3d Cir. 1994).

Section 330 provides a nonexclusive list of factors to consider in fixing the "reasonable" amount of compensation:

> In determining the amount of reasonable compensation to be awarded to [counsel for a debtor in possession], the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including–
>
> (A)  the time spent on such services;
>
> (B)  the rates charged for such services;
>
> (C)  whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)  whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E)  with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F)  whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). The statute also instructs the court to disallow compensation for duplicative, nonbeneficial, and unnecessary services. Id. § 330(a)(4)(A).

5

These factors are similar to those used to determine awards under federal fee-shifting statutes. Therefore, "§ 330 and fee-shifting statues are sufficiently similar to justify applying the same general principles for fee enhancements." In re Manoa Finance Co., 853 F.2d 687, 691 (9th Cir. 1988); In re Meronk, 249 B.R. 208 (B.A.P. 9th Cir. 2000) (holding that Manoa Finance is still valid after the 1994 amendments to section 330(a)).[1]

Fee enhancements are only available in exceptional cases. There is a "strong presumption" that the reasonable fee equals a reasonable hourly rate multiplied by the number of hours actually and reasonably expended (the "lodestar"). Manoa Finance, 853 F.2d at 692. The court generally may not adjust the lodestar based on factors that are subsumed in the hourly rates or the hours expended. These factors include "(1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, and (4) the results obtained." Manoa Finance, 853 F.2d at 691, citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986) ("Delaware I") (emphasis added). An adjustment based on these factors is warranted "only when it is shown by specific evidence that they are not

---

[1]Section 330(a)(2) permits the court to award less than an applicant requests, but does not forbid the court from awarding more than the lodestar when requested in an appropriate case.

U.S. Bankruptcy Court - Hawaii   #07-00176   Dkt # 921   Filed  11/23/11   Page 6 of 13

fully reflected in the lodestar," <u>Manoa Finance</u>, 853 F.2d at 691, and that "the bonus is necessary to make the award commensurate with compensation for comparable nonbankruptcy services[.]" <u>Id.</u> at 692.

## DISCUSSION

The law firms seek a fee enhancement based on two factors: the risk of nonpayment; and the excellent outcome of this case. The Office of the United States Trustee objects, contending that there was no real risk of nonpayment; excellent results alone do not justify an upward adjustment; and an unusually large proportion of the work was done by senior attorneys with higher billing rates, thus increasing the total fee. HHSC also objects, contending that the State funding gave the debtor an "unusual headstart" and the result is partly attributable to the hospital regulatory work done by HHSC, not the debtor or its counsel.

### *Risk of Nonpayment*

A plurality of the Supreme Court has held that the risk of nonpayment will not justify an enhancement under the typical fee-shifting statute. A majority of the Court has held that, even if the applicable statute permits a risk-based enhancement on that basis, such an adjustment is proper only in exceptional cases. <u>Pennsylvania v. Delaware Valley Citizens Council for Clean Air</u>, 483 U.S. 711, 728 (1987) ("<u>Delaware Valley II</u>").

U.S. Bankruptcy Court - Hawaii   #07-00176   Dkt # 921   Filed  11/23/11   Page 7 of 13

The Ninth Circuit has questioned whether the risk factor could justify an enhancement in a bankruptcy case:

> [W]hile awards under fee-shifting statutes are by their nature contingent, the risk of nonpayment in bankruptcy cases generally arises only in the event of insufficient funds in the estate to pay for the services rendered.

Manoa Finance, 853 F.2d at 691 (emphasis added). Experienced bankruptcy practitioners well understand that there is a real risk of nonpayment, due to insufficient funds, in all too many cases.

Assuming that an upward adjustment for risk is available in a bankruptcy case, the risk in this case was not great enough to warrant a sizable adjustment.

There was a risk of nonpayment only during certain phases of this case. Counsel took the case with a very small retainer ($11,461.00 for general counsel and apparently none for special counsel). This put counsel at risk until the State of Hawaii provided the $950,000 grant, but the grant was approved only about a month after the filing. The risk of nonpayment reappeared when the debtor's cash reserves ran low while the sale was pending, but the closing of the sale ended the risk once and for all. In any event, the risk of nonpayment was never large. The State of Hawaii was committed to keeping the hospital in business and provided plenty of money for that purpose. Although the money did not arrive as quickly as

8

the debtor and its counsel would have hoped, there was never any serious doubt

that the State would eventually perform.  The modest risk of nonpayment and

temporary delays in payment are relevant to determining reasonable compensation,

but they do not independently justify a sizable upward adjustment.

### *Results Achieved*

Fee enhancements based on excellent results are rarely appropriate.

> [W]hen an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves <u>very little room for enhancing the award based on his post-engagement performance</u>. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

<u>Delaware I</u>, 478 U.S. at 565-66 (emphasis added).

In a bankruptcy case, the measure of success is the amount recovered for

creditors.  Only rare bankruptcy cases result in full payment of all creditor claims

and a surplus for equity holders. <u>United Savings Assoc. v. Timbers of Inwood</u>

<u>Forest Assoc.</u>, 484 U.S. 365, 379 (1988).  But the creation of a surplus estate does

not change the applicable legal standard and is not an independently sufficient

basis for a fee enhancement.  Meronk, 249 B.R. at 214.  Rather, the applicant must produce specific evidence showing that the lodestar is not reasonable in the circumstances of the case.

The results of this case were unusual and exceptionally good for the creditors.  All secured and unsecured creditors were paid in full with interest, leaving a surplus of about $1,000,000.00.

The debtor's general and special counsel made a substantial contribution to this outcome.  Counsel negotiated and helped to consummate the sale, and then challenged questionable claims.  There would have been no surplus if the sale did not close and the unsubstantiated claims were not eliminated.

Under the controlling case law, however, this impressive result is not an independently sufficient basis for an upward adjustment.

### Other Factors

I conclude, however, that the Gelber firm has understated its lodestar fee.

First, as counsel for the U.S. Trustee pointed out at the hearing, the estate's general counsel did not bill for the time spent preparing the final compensation applications.  The court may allow reasonable compensation for preparing and presenting fee applications in bankruptcy cases, In re Nucorp Energy, Inc., 764 F.2d 655 (9th Cir. 1985), and for successfully defending such applications, In re

10

Smith (Smith v. Edwards & Hale, Ltd.), 317 F.3d 918, 928 (9th Cir. 2002), but perhaps not for unsuccessfully defending applications, In re Riverside-Linden Inv. Co., 945 F.2d 320 (9th Cir. 1991).

Based on the timesheets, general counsel incurred (but did not charge) fees of $9,757 (plus general excise tax) to prepare the fee application and $24,851 (plus general excise tax) to prepare a reply memorandum responding to the objections to the request for an upward adjustment.

Second, the Gelber firm charged the estate at its usual hourly rates. The lodestar fee is based on a "reasonable" hourly rate, In re Eliapo, 468 F.3d 592, 598 (9th Cir. 2006); Delaware I, 478 U.S. at 565-66, which may or may not be the same as an attorney's usual rate. The hourly rate charged by Don Gelber during the first period of the case was unreasonably low, considering his skill and experience. Mr. Gelber billed his time in this case at $390 per hour until February 26, 2009, and $430 thereafter. Mr. Gelber is one of the most expert business reorganization attorneys in this jurisdiction. He has approximately forty years of experience and has had major roles in many of the largest cases before this court. His work is uniformly of the highest caliber. Nevertheless, his rates are not the highest charged by bankruptcy attorneys in Hawaii, and are substantially less than the rates charged by comparably experienced attorneys based on the mainland

11

($500 to $1,000 per hour or more).

Hawaii is a small state with a small bankruptcy bar and an even smaller cadre of attorneys with experience representing chapter 11 debtors in possession. The attorney whose expertise and experience most closely resembles Mr. Gelber's is James Wagner. Mr. Wagner charged (and the court approved) at least $425 per hour at the time Mr. Gelber was charging $390 per hour. See, e.g., bk. no. 05-50011, dkt. no. 1814, 1891; bk. no. 07-00249, dkt. no. 162, 173; bk no. 08-01448, dkt. no. 632, 643; bk. no. 08-00337, dkt no. 1415, 1469. In the circumstances of this case, a reasonable hourly rate for Mr. Gelber would be at least $425 per hour from the commencement of the case.

This results in an increase of the lodestar by $36,228.50 plus tax for the Gelber firm. In addition, the Gelber firm is entitled to compensation for the preparation and presentation of its fee application and a portion of the work done in defense of that application (since the defense was only partly successful). The reasonable amount of such compensation is $17,000.00 plus tax.

While there is enough information in the record of this and other cases to establish that Mr. Gelber's hourly rate should be increased, there is not sufficient information to determine that the usual rate charged by the Torkildson firm is insufficient. George Hetherington is a well-respected and highly experienced

12

attorney in his practice areas. He performed his duties with exceptional

professionalism and expertise. Nevertheless, the record does not reflect that Mr.

Hetherington's rate was unusually low compared to similar professionals in the

community.

Counsel for the debtor is directed to submit proposed orders consistent with

this memorandum.

/s/ Robert J. Faris
United States Bankruptcy Judge
Dated: 11/23/2011

13